UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEW HAMILTON LIQUOR STORE, INC.,
ET AL.,

        Plaintiffs,

v.

AMGUARD INSURANCE COMPANY,

        Defendant.
_____/

Case No. 17-13077

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE R.
STEVEN WHALEN

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [36] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [37]**

Plaintiffs bring this diversity suit against their insurance company to enforce their contractual rights to their insurance coverage. After Plaintiffs' liquor store burned down, Defendant, the insurance company AmGuard, refused to pay the claim. It reasoned that the coverage was excluded by Plaintiffs' failure to maintain an automatic fire alarm. Parties have filed cross-motions for summary judgment [36 & 37]. The motions are fully briefed, and the Court held a hearing on the motions on June 17, 2020. For the reasons articulated below, Defendant's motion will be granted, and Plaintiffs' motion will be denied.

**FACTUAL BACKGROUND**

Talib Hermiz bought New Hamilton Liquor Store, Inc., along with the company Mr. K & Hamilton, LLC—which owned the building 12150 Hamilton Ave

in Highland Park—on March 17, 2009. (Hermiz Deposition, ECF No.37-11 at 18-19, 54). Hermiz consulted with an insurance agent Rod Kathawa regarding this business. (*Id*. at 46). Starting in April or May of 2016, Hermiz met three times with Kathawa. At the second meeting, they decided on the insurance plan which was offered through Defendant Amguard. (*Id*. at 89-93). Kathawa asked Hermiz if he had an alarm. (*Id*. at 126). Hermiz said that he did, and Kathawa asked no further questions of alarms. On the third meeting Hermiz signed the contract, which was thereafter mailed to him. The contract contained a Protective Safeguard Endorsement ("PSE"). Hermiz acknowledged that he read the PSE, but he stated that he "did not understand." (Hermiz Dep. 125).

The PSE was headlined, in all caps, "THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY." (ECF No. 36-2). The PSE had a table listing, under "Protective Safeguards Symbols Applicable," the code "P-2." Next to that box, there was another box labelled "Description of "P-9" if Applicable." The box beneath that read "Local Burglar Alarm Fire Alarm." Sub-part A of this page-long contract modification defined both "Automatic Sprinkler System" and "Automatic Fire Alarm." "P-9" was defined as "the protective system described in the schedule." Sub-part B amended the contract's provisions on exclusions. (*Id*.). It provided as follows:

> We will not pay for loss or damages caused by or resulting from fire, if prior to the fire, you:

> 1. Knew of any suspension or impairment in any protective safeguard listed in the schedule above, and over which you had control, in complete working order.
> 2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

(*Id*.).

Mr. Hermiz had only three motion-detecting alarms in his store. Each alarm was located near a door. (ECF No. 37-16, PageId.2569). On Sunday, August 28, 2016, at 3:51:10, 3:51:11, and 3:51:13, all the alarms went off, alerting to motion within the store. (ECF No. 36-6, PageId.2041). The alarm center then placed two calls to the store to ascertain if anyone was there, and a third call to the local police department. The Police Department dispatched an officer to the scene, and, either by the officer's call, or by some third party's actions, the Highland Park Fire Department was notified at 3:54. Firefighters arrived at 3:58. (Erwin Deposition, ECF No. 36-8, pg. 19). Though the fire was not under control until 6:10 a.m., active flames were quenched within 10 to 15 minutes of the firefighters' arrival. (*Id*. at 23). Mr. Hermiz saved no inventory from the store, and has not since reopened the store, which remains shuttered. Subsequent investigation established that the fire was an arson. Someone placed a ladder next to the store, climbed to the roof, cut a hole through the roof with a power saw, and then poured gasoline into the hole. (*Id*. at 29).

After sending an expert, Joseph Nowikowski, into the store to investigate, Amguard denied Hermiz's claim. They based their denial on the fact that he had failed to install an automatic fire alarm as required by the contract.

## PROCEDURAL BACKGROUND

Plaintiffs brought this suit on September 1, 2017 in Circuit Court for the County of Wayne. Defendants removed the suit to federal court on September 17, 2017. (ECF No. 1). Plaintiffs and Defendant filed these cross-motions for summary judgment on February 21, 2020, and February 24, 2020. (ECF Nos. 36, 37). Defendant has also filed a motion to exclude the testimony of Robert Trenkle. (ECF No. 38). The Court held a remote hearing on June 17, 2020 and took all three motions under advisement.

## STANDARD OF REVIEW

Both parties move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. When evaluating movants' motions for summary judgment, the Court must consider the evidence on the record, drawing all inferences in non-movants' favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The question on summary judgment is whether the moving party has demonstrated that the evidence available to the court establishes no genuine issue of material fact such that it is entitled to a judgment as a matter of law." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009). The moving party

has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party "may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations…[but instead] must present affirmative evidence." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (quoting *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)).

## ANALYSIS

At issue is whether or not Plaintiffs' motion sensor alarm system qualified as an "automatic fire alarm" under the Protective Safeguard Endorsement of the insurance contract. Michigan law governs this diversity action.

### I. Contractual Interpretation

In eliminating the doctrine of reasonable expectations, the Michigan Supreme Court held that "one's alleged 'reasonable expectations' cannot supersede the clear language of the contract." *Wilkie v. Auto-Owners, Ins. Co.*, 469 Mich. 41, 60 (2003).

Whether or not Hermiz reasonably believed that he was in compliance with his insurance company is therefore not relevant. *See id* at 58-60; *see also VanDyke v. League General Ins. Co.*, 184 Mich. App. 271 (1990) ("An insured is obligated to read his or her insurance policy and to raise questions concerning coverage within a reasonable time after the policy is issued."). The PSE is a condition-precedent of the contract, and a Plaintiff's failure to abide by its terms will preclude coverage, as contemplated by subpart B of the PSE. See, e.g., *Am. Way Cellular, Inc. v. Travelers Prop. Cas. Co. of Am.*, 216 Cal. App. 4th 1040, 1054 (Cal. Ct. App. 2013) (surveying cases nationally to opine that failure to install fire sprinklers where required in PSE negated fire insurance coverage).

### A. Plain Language of the Contract

The Court's first task is to determine whether or not the contract was ambiguous. "If no reasonable person could dispute the meaning of ordinary and plain contract language, the Court must accept and enforce the language as written, unless the contract is contrary to law or public policy." *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 130 (Mich. Ct. App. 2007). The meaning of such clear and unambiguous contract language is a matter of law. *Id*. When the words used by the parties are unambiguous and have a definite meaning, the court should not review extrinsic evidence to determine the parties' intent. *State Farm Fire & Cas. Co. v.*

*Liberty Ins. Underwriters, Inc.,* 613 F. Supp. 2d 945, 954 (W.D. Mich. 2009); *Zurich Ins. Co. v. CCR & Co.,* 226 Mich. App. 599, 606-07 (Mich. Ct. App. 1997).

By contrast, an ambiguous contract provision can raise a question of fact as to the interpretation of extrinsic evidence. "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Read Prop. Grp. LLC v. Hamilton Ins. Co.*, No. 16 CV 457, 2018 WL 1582291, at *7 (E.D.N.Y. Mar. 30, 2018) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); see also *Farm Bureau Mut Ins Co v Nikkel*, 460 Mich. 558, 566 (1999)) ("A contract is said to be ambiguous when its words may reasonably be understood in different ways."). "[A]mbiguity does not exist simply because the parties urge different interpretations," *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001).

The term "automatic fire alarm" in the PSE included no definition for fire alarm. Both Plaintiff and Defendant argue that the PSE is unambiguous and should be read in their favor. Plaintiff argues that a "fire alarm" is any alarm that can detect a fire, as the motion sensors in the shop did. Defendant argues that a "fire alarm" clearly refers to an alarm designed to detect fires.

"Fire alarm" is not an ambiguous term. The Merriam Webster Dictionary defines a fire alarm as "a device that makes a loud sound to warn people when there is a fire." Merriam Webster, Fire Alarm, https://www.merriam-webster.com/dictionary/fire%20alarm. Last accessed on July 17, 2020. The Longman Dictionary of Contemporary English defines it as "a piece of equipment that makes a loud noise to warn people of a fire in a building." Longman, https://www.ldoceonline.com/dictionary/fire-alarm, last accessed on July 17, 2020. The Oxford English Dictionary defines it as "a device or system designed to raise the alarm in the event of a fire, typically by emitting a loud noise." "fire, n. and int.". OED Online. June 2020. Oxford University Press. https://www.oed.com/view/Entry/70512?rskey=tswxLo&result=1&isAdvanced=false (accessed July 21, 2020). What these three definitions have in common is a sense that the term "fire alarm" unambiguously refers to a device meant to alert people of the presence of a fire.

Plaintiffs' alarm system does not fit this definition. Putting aside the question of whether their alarm was "automatic," (a disputed question the Court need not reach) it is not even a fire alarm, for the alarm wouldn't warn any people in the building of a fire. The alarm was not activated until people in the building left, because the alarm would alert to any human presence, and therefore was only used

after the building was closed. It was an alarm designed to prevent intrusions, not to protect against fires, which can also start while businesses are open.

There is no circumventing the simple fact that Plaintiffs' alarm was an automatic burglary alarm, not an automatic fire alarm. This is why the alarms were clustered around the entrance to the building. (ECF No. 37-16). It is also why National Alarm received, on August 28, 2017 at 3:51:09 an alert that was described on the log as INTERIOR BURG 'ZN5 BACKROOM MOTION. (ECF N0. 37-6, PageId.2184). It is also why the police, not the fire department, were initially dispatched to the scene. (*Id*.). Absent any meaningful ambiguity in the PSE, the Court has no basis to consider extraneous evidence such as Plaintiffs' expert witness's testimony.

Plaintiffs also contend that the layout of the P-2 and P-9 requirements in the PSE were ambiguous. They argue that the description "Local Burglar Alarm Fire Alarm" was ambiguous, because it can be interpreted as Burglar Alarm *and* Fire Alarm or Burglar Alarm *or* Fire Alarm. Such an interpretation would conflict with the scheduling of P-2 as an "automatic fire alarm." P-2 was clearly defined as an automatic fire alarm, and it was immediately followed by an exclusion that warned that Amguard "will not pay for loss or damages caused by or resulting from fire if, prior to the fire, you…[k]new of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact;

or….[f]ailed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." (ECF No. 37-4, PageId.2172).

Given the context of the PSE, therefore, Plaintiffs' argument—that they were not on notice that the PSE required an automatic fire alarm—is unreasonable. Given the unambiguous every-day usage of the term "fire alarm," there is also no reasonable way to understand the term to encompass the alarms present in Plaintiffs' store. Further, even if it the PSE were ambiguous, Plaintiffs would still be unable to demonstrate a material dispute of fact as to the overwhelming extrinsic evidence against them.

### B. Extrinsic Evidence

Plaintiffs' proffered source of extrinsic evidence is the events that transpired on the night of the fire. They rely on the deposition of a firefighter, Lieutenant Erwin, and their expert, Robert Trenkle, to construct a narrative in which the fire was rapidly extinguished, because of the early intervention of the motion detecting alarm. Defendant relies on its expert, John Nowikowski, both to dispute the veracity of this narrative and to testify that the alarms in question were not fire alarms.[1]

---

[1] Mr. Hermiz's conversations with Mr. Kathawa will not constitute a defense to the PSE, because in Michigan an insurance broker is considered an agent of the buyer, not of the insurance company. *Genesee Foods Services, Inc. v. Meadowbrook, Inc.,* 279 Mich.App. 649, 654 (Mich. Ct. App. 2008).

Defense expert and electrician John Nowikowski testified as to the differences between motion sensors and fire alarms. He observed that the burglar alarms installed in the shop were "passive infrared sensors" (PIR-based) designed to detect the infrared energy emitted by human beings. (Nowikowski Deposition, ECF No. 37-14, pg. 52-53). They emit bands of energy that activate the alarm when two of the bands detect infrared energy in that range. (*Id*.). The range of detectable infrared energy is small, by design, in order to minimize false alarms. (*Id*. at 62-65). As a result, they are marked by Underwriters Laboratories ("UL") as burglar alarms, not fire alarms. (*Id*.). Fire alarms, by contrast, are held to higher regulatory standards under the National Fire Protection Association, marked as such by UL, and generally rely on smoke detection. (*Id*. at 46-49). Though Nowikowski explained that though there are some types of fire alarms designed to detect heat—which would be used in large atriums, for example—a building like the liquor store would typically be covered by as few as two smoke detectors. (*Id*. 65-80).

Nowikowski sharply disputed the proposition that a motion detector could ever be considered a fire alarm according to the industry understanding. (*Id*. at 81). He opined that at best the motion sensors detected the fire only once it had spread so far that they detected particulate matter from the fire. (*Id*. at 129-34). The alarm was activated only once the fire had grown to a considerable size, which is why when the firefighters arrived 3 minutes later, they could see flames coming from the roof. (Id.).

Plaintiffs' expert Robert Trenkle opined that the motion detectors in the shop adequately did their job and that perhaps were even more effective than a fire alarm. (Robert Trenkle Dep. at 219-20). He testified that the fire was detected almost immediately by the three motion detectors. Trenkle, a former fire-fighter and currently arson expert, was hard-pressed in his deposition to provide information on alarm systems. (Id.). Defendant has filed a *Daubert* motion to disqualify Trenkle as an expert, arguing that his expertise in fire science is not helpful for the question of interpreting a provision on fire alarms. Plaintiffs argued that Defendants' Daubert motion is misplaced.

> Plaintiffs acknowledge Mr. Trenkle is not an expert in fire alarm systems, as does Defendant (Defendant's Motion, ¶7), and do not intend to offer him as an alarm system expert under FRE 702. Mr. Trenkle has and will be testifying, *inter alia*, that the system installed in Plaintiff's building "did exactly what a firm alarm is supposed to do."

(ECF No. 40, PageId.2930).

Plaintiffs will then rely only on his lay testimony as to what he "viewed, encountered and learned at this fire scene." (ECF No. 40, PageId.2931).

Even if the Court were to allow Trenkle to testify fully as to his expert opinion about the origin and lifespan of the fire, and as to his lay opinion about what he encountered at the fire scene, he would still describe only how Plaintiffs' alarm functioned on the morning of the fire. This would not defeat Defendants' defense under the PSE, however, for the fact that a device alerted to fire once would not

qualify it as an "automatic fire alarm" any more than a guard dog would qualify as such an alarm if it alerted the neighbors of the fire.

The PSE is clear that failure to maintain an automatic fire alarm, or knowledge of its suspension or impairment, is grounds for excluding coverage in the event of a fire. Its plain language does not contemplate that the efficacy of any device in alerting to the fire at issue is at all relevant to whether that condition for exclusion is triggered. Trenkle's testimony that Plaintiffs' alarm alerted to a fire would, as a matter of law, fall short of proving that it is a fire alarm. Such testimony would could prove nothing of the design or intended use of the device, and it would not even contradict Nowikowski's expert testimony that the term "automatic fire alarm" refers to an entirely different category of technology.

Because they were not in compliance with the PSE, Plaintiffs cannot recover on their breach of contract claim. There is therefore no need to reach the question of whether to reform the contract to allow New Hamilton a right of recovery. Nor is there a need to consider the Michigan Uniform Trade Practices Act, which would only provide penalty interest on a recovery on the breach of contract claim. *Pantos Investment Company v. Peerless Indemnity Insurance Company*, 2017 WL 4678451 (Mich. Ct. App. Oct. 17, 2017) (citing *Isagholian v. Transamerica Ins. Corp.*, 208 Mich. App. 9 (1994)).

## CONCLUSION

Talib Hermiz's liquor store no doubt represented an important part of his livelihood. He may have felt he had adequately protected his assets by paying both an automated alarm system and purchasing an insurance plan. There is no indication, however, that he complied with the conditions of the insurance contract. He signed an endorsement stating that he had a fire-alarm, and that if that alarm system was not maintained, coverage for fire damage would be excluded. Plaintiffs therefore cannot recover damages to the insured property.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment [36] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [37] is **GRANTED**.

**SO ORDERED**.

Dated: July 23, 2020

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge